Ronald D. LUNSFORD, Jr., Hazen E. Upham, and David Gary, Plaintiffs–Appellants,

v.

Timothy BENNETT, Donald Jarrett, Laura Perry, et al., Defendants–Appellees.

No. 93–1763.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1993.

Decided March 16, 1994.

Richard A. Waples (argued), Indianapolis, IN, John Emry, Franklin, IN, for plaintiffs-appellants.

John D. Ulmer, Michael F. DeBoni (argued), Yoder, Ainlay, Ulmer & Buckingham, Goshen, IN, for defendants-appellees.

Before WOOD, Jr., EASTERBROOK, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Ronald D. Lunsford, Hazen E. Upham, and David Gary brought this civil rights action against several Indiana prison and county officials under 42 U.S.C. § 1983 alleging that the defendants (1) violated the plaintiffs' rights under the Eighth and Fourteenth Amendments to the United States Constitution, (2) violated the plaintiffs' Fifth Amendment Due Process rights, and (3) assaulted and battered the plaintiffs in violation of the Indiana Constitution, Article I, § 15.[1] The complaint names Timothy Bennett, Donald Jarrett, Laura Perry, and Richard Truex as defendants in their individual capacities, and Randall Yohn in his capacity as Sheriff of Elkhart County, Indiana.

Plaintiffs appeal from the district court's order granting summary judgment for the defendants. The district court dismissed with prejudice the plaintiffs' federal law claims, and declined to exercise pendant jurisdiction over the plaintiffs' state law claims. For the reasons discussed below, we affirm.

## I. BACKGROUND

The events that form the basis of plaintiffs' complaint occurred over a three day period in late December, 1989. Lunsford, Upham, and Gary were convicted prisoners being held in Ward 9, a ward used for disciplinary segregation, of the Elkhart County Security Center. Plaintiffs complain that during this three day period they were deprived of basic hygiene items, subjected to loud noises over the intercom, served poorly-prepared food, and verbally and physically abused by defendants.

Tension in the jail began to build on December 24, 1989, when plaintiffs were denied toilet paper, personal hygiene items, and cleaning supplies. Lunsford and Gary testified that this continued for approximately a twenty-four hour period between the 24th and 25th, while Upham states that he did not receive any hygiene items for a twenty-four hour period between December 25 and 26. Plaintiffs also complain that they were forced to listen to sporadic loud noises over the intercom.[2] The source for these noises was

---

1. Because Upham and Gary failed to file tort claim notices in compliance with Ind.Code § 34-4-16-1 et seq., the district court held that they are barred from proceeding on the Indiana Constitution claim. Upham and Gary do not appeal this decision.

2. Lunsford states that this occurred between four to eight p.m. on December 24, 25, and 26. Lunsford dep. at 21-22. He described these noises as music and loud talking. Gary described the sounds as an "eerie siren-type noise ... sort of a noise like scratching on a car or cardboard and different verbal things that was being said that sounded like when you're pushing a buzzer and it's just going 'ehn-n-n-n-n,'" and stated that they occurred over a twenty-four hour period between December 25 and 26. Gary dep. at 41.

the third floor control room allegedly under the defendants' control. Plaintiffs' repeated requests to use a telephone and to speak with higher ranking prison officials about the problem were denied.

At lunch on December 26, plaintiffs were served as part of their meal cold, poorly-prepared beans. Upset with this course of treatment, the prisoners (including plaintiffs) threw their trays, dishes, and eating utensils to the floor of the catwalk outside of their cells.

When a new shift of guards came on duty at 3:00 in the afternoon, they were advised by Officer Snyder about the lunch incident. Officers Snyder, Truex, Perry, and Bennett then did a "shakedown" search in Ward 9 to determine if any items had been kept by the prisoners. During the search the guards and prisoners were verbally abusive to one another, and some of the prisoners threatened to flood the ward.

Dinner was again unsatisfactory to the prisoners prompting them to throw their plates and utensils to the floor. Later, after being subjected to more loud noises over the intercom, all of these events culminated in an act of protest by the prisoners: they flooded Ward 9. The plaintiffs, along with the other prisoners, placed styrofoam cups in their individual toilets and began flushing. Continuing this action for approximately twenty minutes caused the toilets to overflow and flood the ward with several inches of water. Although the water emanated from the toilets, the water was clean and did not contain any sewage particles.

Laura Perry, the officer in charge, contacted Sergeant Marks, her immediate supervisor, to discuss the situation. Marks instructed Perry to remove the prisoners from their cells, secure them to the "catwalk" immediately adjacent to the cells, and clean up the water. Officer Marks was concerned about property damage being caused by prolonged flooding.

Acting on Perry's instruction, Officers Bennett, Perry, Truex, Jarrett, and other jail officers, removed the prisoners from their cells and shackled them to the bars of the flooded cells rather than placing them in any of several open detention units. Specifically, plaintiffs were shackled by their hands and feet to their cells standing ankle-deep in water while the water was cleaned up. Lunsford testified in his deposition that he was facing the bars with his hands shackled above his head, but his arms were not completely stretched out, and that Gary and Upham were bound in the same position. Upham testified, however, that his arms were stretched out straight above his head.

During the cleanup Lunsford spit at Officer Truex, and Truex returned fire. Lunsford also spit at Officer Perry and other officers. While the officers cleaned up the water, the inmates (including plaintiffs) and officers talked "trash" to one another, and splashed water on one another using their feet. Officer Jarrett allegedly called Gary a black SOB. Lunsford testified that Upham splashed and kicked water on the officers, although Upham denies participating in this exchange. Officers Truex and Bennett responded by picking up a bucket of water and pouring it over Upham. Upham claims that when the water was poured on him he was hit in the head twice by the bucket, once as the water was dumped on his head and once as the bucket was removed. Since being hit in the head with the bucket, Upham claims that he gets daily headaches though he is still able to work.

Approximately two hours after the flooding began both Lunsford and Upham discovered that the shackles were loose enough to allow them to remove their hands. When the officers noticed Lunsford and Upham with their hands free, they tried to reshackle both individuals. Upham did not resist the officers' actions and suffered no injuries. Lunsford, however, refused to be reshackled or cuffed in front, so Officers Bennett, Truex, and Jarrett struggled with Lunsford and forcefully reshackled him to the bars. The officers did not hit or beat Lunsford, but Officer Jarrett is alleged to have used excessive force when resecuring Lunsford. Lunsford continued to struggle after being returned to the handcuffs. An hour later prison officials released the prisoners and returned them to their cells. At this time Lunsford complained about pain in his left arm and shoulder, and bleeding from his right wrist. Pris-

on officials took Lunsford to Goshen General Hospital for treatment. Hospital personnel diagnosed his injuries to be minor abrasions to the wrists and a pull or muscle strain in his shoulder.

Plaintiffs complain that this series of abuses, when viewed in their totality, constitute cruel and unusual punishment in violation of the Eighth Amendment. Plaintiffs also argue that by inflicting punishment without any form of notice or hearing, the defendants violated their Fifth Amendment Due Process rights. We find these arguments to be without merit.

## II. ANALYSIS

We review the district court's order granting summary judgment *de novo*, viewing all facts in favor of the plaintiffs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). No material facts exist here so as to preclude us from affirming the district court's decision.

The central claim alleged in plaintiffs' complaint concerns violations of the Eighth Amendment. "Cruel and unusual punishment" of individuals convicted of crimes is prohibited by the Eighth Amendment and applies to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962). For plaintiffs to show that the prison officers' conduct over the three day period violated the Eighth Amendment, they must satisfy a test that involves both a subjective and objective component. *Wilson v. Seiter*, 501 U.S. 294, ——, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). The objective analysis focuses on the nature of the defendants' acts, and whether the conditions they were forced to endure exceeded contemporary bounds of decency of a mature, civilized society. *Jackson v. Duckworth*, 955 F.2d 21,

22 (7th Cir.1992). This is necessarily a difficult and imprecise contextual inquiry. *Hudson v. McMillian*, —— U.S. ——, ——, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992); *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981); *Trop v. Dulles*, 356 U.S. 86, 100–101, 78 S.Ct. 590, 597–98, 2 L.Ed.2d 630 (1958). The subjective component, really an inquiry into intent, requires us to ask whether the prison officials acted wantonly and with a sufficiently culpable state of mind. *Wilson*, 501 U.S. at ——, 111 S.Ct. at 2326. "Wanton" has a different meaning depending on the category of the alleged constitutional violation. For instance, in a prison disturbance situation, *Whitley v. Albers*, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) held that wantonness consisted of acting " 'maliciously and sadistically for the very purpose of causing harm.' " *Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973). This high state of mind threshold is different in cases alleging inadequate conditions of confinement where a "deliberate indifference" standard is used. *Wilson*, 501 U.S. at ——, 111 S.Ct. at 2326–27; *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Also, determining "whether [conduct] can be characterized as 'wanton' depends upon the constraints facing the *official.*" *Wilson*, 501 U.S. at ——, 111 S.Ct. at 2326. If either the objective or subjective portion is not satisfied, plaintiffs cannot make out an Eighth Amendment claim. We examine the essential facts under both parts of this test. Where we find that plaintiffs cannot meet the subjective component, we do not address the objective component.

### A. Conditions of Confinement

The initial complaints lodged by plaintiffs concern the conditions imposed on their confinement. In this regard the Eighth Amendment is implicated only in those cases where a prisoner is deprived of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Plaintiffs claim that they were denied basic hygiene items, subjected to loud noises over the intercom, and served poorly-prepared

food. Neither the objective nor subjective parts of the test are satisfied for these claims.

▇▇▇ Here the delay in providing plaintiffs with requested hygiene supplies is not the type of extreme deprivation required to establish an objective violation. *Compare Harris v. Fleming,* 839 F.2d 1232 (7th Cir. 1988), *with Jackson,* 955 F.2d at 22. At most this can be argued to be negligence by prison officials. Lunsford and Gary did not receive personal hygiene items for approximately a twenty-four hour period between December 24th and 25th. Upham claims that he did not receive hygiene or cleaning supplies for a twenty-four hour period between December 25 and 26. This temporary discomfort affecting only a few prisoners hardly violates common notions of decency. *See Harris,* 839 F.2d at 1234–36. The record contains no evidence indicating that plaintiffs' cells were unusually dirty or unhealthy, or that health hazards existed. Moreover, the guards were not deliberately indifferent to the plaintiffs' requests as they provided each of the plaintiffs with the requested materials after twenty-four hours. *See Hudson,* —— U.S. at ——, 112 S.Ct. at 1001. Regarding the subjective component, *Duckworth v. Franzen,* 780 F.2d 645 (7th Cir.1985), is the law in this circuit regarding the minimum intent requirement. The prison officials must have "actual knowledge of impending harm easily preventable." *Id.* at 653. *See also McGill v. Duckworth,* 944 F.2d 344, 348–49 (7th Cir. 1991) (discussing Seventh Circuit case law on the subjective component of Eighth Amendment analysis). Even accepting the plaintiffs' story that their requests for personal hygiene items were refused by defendants does not meet the minimal intent standard stated in *Franzen.* The chance of harm resulting from the temporary failure to provide personal hygiene items is too remote for plaintiffs to meet this subjective requirement, and thus this claim must fail. *See Wilson,* 501 U.S. at ——, 111 S.Ct. at 2326; *Jackson,* 955 F.2d at 22.[3]

▇▇▇ Neither the loud noises nor the poorly-prepared food claims satisfy the subjective component. Mere negligence does not satisfy the deliberate indifference standard. Rather, plaintiffs must demonstrate

"something approaching a total unconcern for [his] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v. Lane,* 959 F.2d 673, 677 (7th Cir.1992), *citing McGill v. Duckworth,* 944 F.2d 344, 347 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992) and *Franzen,* 780 F.2d at 653. The record contains no evidence that the noise levels posed a serious risk of injury to the plaintiffs. Subjecting a prisoner to a few hours of periodic loud noises that merely annoy, rather than injure the prisoner does not demonstrate a disregard for the prisoner's welfare. Similarly, the plaintiffs' complaints about cold and poorly-prepared food must fall. The affidavit of Nancy Truex, Food Services Director of the Elkhart County jail, states that the prisoners received three square meals a day in compliance with nutritional guidelines set by a Goshen Hospital dietician. *See Smith v. Sullivan,* 553 F.2d 373, 380 (5th Cir.1977) ("A well-balanced meal, containing sufficient nutritional value to preserve health, is all that is required."). The record contains no evidence contradicting this fact or demonstrating deliberate indifference by prison officials. *See Hoitt v. Vitek,* 497 F.2d 598, 601 (1st Cir. 1974). Additionally, we find that these food and noise claims do not satisfy the objective portion of the analysis as neither can be found to offend contemporary standards of decency.

▇▇▇ Perhaps realizing that their individual complaints about food, noise, and hygiene do not implicate the Eighth Amendment, they assert that we must view this case in the totality rather than as separate claims. In this regard our work is easy for the *Wilson* Court has already set the standard. "*Some* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure

---

3. Lunsford also individually claims that he was denied the use of a telephone for a twenty-four hour period preceding December 26. For the same reasons discussed above, this claim does not meet either the objective or subjective tests for cruel and unusual punishment.

to issue blankets." *Wilson*, 501 U.S. at ——, 111 S.Ct. at 2327. Here the cumulative effect of plaintiffs' complaints do not add up to the deprivation of a single human need. They received food in accordance with prison and constitutional guidelines; hygiene items were provided within a constitutionally permissible time frame; and the loud noises did not deprive the prisoners of rest or other necessity. We find no threat to human health or safety posed by any of plaintiffs' complaints about the conditions imposed during their stay at the Elkhart County Security Center. The Constitution does not require prison officials to provide the equivalent of hotel accommodations or even comfortable prisons. Occasional discomfort is "part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399.

In summary, the conditions of plaintiffs' confinement, either when viewed separately or in their totality, were not noisome or offensive enough to violate common standards of decency, did not implicate the Eighth Amendment, and the issues were ready to be decided on summary judgment. In reaching this conclusion we realize the judiciary's important role in protecting prisoners from unmindful prison officials, *see, e.g., Lightfoot v. Walker*, 486 F.Supp. 504 (S.D.Ill.1980), and the importance of providing at least a minimal level of cleanliness and sanitation for the health and safety of the prisoners. Minimal standards were clearly met here.

### B. The Flood

■ We are left with the December 26 incident as the basis of the plaintiffs' complaint. Focusing on the subjective part of the analysis, our task is to determine "'whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Whitley*, 475 U.S. at 320–21, 106 S.Ct. at 1085, *citing Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *Hudson*, —— U.S. at ——, 112 S.Ct. at 999. Measuring prison officials' conduct under this standard applies in situations where the prisoners have rioted, or when corrections officers are merely attempting to maintain order. *Hudson*, —— U.S. at ——, 112 S.Ct. at 999. Whether the defendants' actions were done in a malicious and sadistic manner to cause harm is a strict and fairly high threshold. Factors relevant to our inquiry include the nature and extent of the harm, the need for force, the threat to the safety of staff and inmates, and the extent of the injury inflicted on the prisoner. *Hudson*, —— U.S. at ——, 112 S.Ct. at 999; *Whitley*, 475 U.S. at 321, 106 S.Ct. at 1085.

■ Once the prisoners flooded the cell block, the guards had to secure the prisoners so that the trustees could mop up the water and prevent physical damage to the prison facility. This required that the prisoners be removed from the cells and restrained appropriately. The guards opened the cells and shackled each prisoner to their cell. Being restrained in this manner for three hours, although uncomfortable, does not seem unreasonable given the circumstances.[4] It allowed the guards to quickly and efficiently restrain the prisoners so that the trustees could immediately begin to cure the problem. Simply because, in retrospect, there was another location that the prisoners could have

---

4. Plaintiffs complain that it took the trustees only forty-six minutes to clean up the water, yet the prisoners were locked to their cells for approximately three hours. The authority they cite in support, however, is unclear if not contradictory to this assertion.

An "Officer's Job Assignment" sheet, Jarrett dep. Exhibit 3, indicates that the flooding began at 6:30 p.m., the trustees began cleanup at 7:20 p.m., and that the prisoners were unlocked at 10:16 p.m. The exhibit does not clearly indicate when the trustees completed the cleanup. The best indication is contained in Lunsford's deposition testimony:

Q: Now, after you were shackled initially, what happened next?

A: Well, we stood there; we hung there for approximately two hours....

Q: Okay. Now, during this two-hour period, what was going on in the jail cell?

A: [The trustees] was trying to clean the water up around us.

Lunsford dep. at 35–36.

Because plaintiffs have failed to establish sufficient facts in the record indicating when the trustees completed the cleanup, we do not address the implications of this argument.

been placed while the water was removed, does not violate any constitutional right.

■ Lunsford complains that Officers Bennett, Truex, and Jarrett physically abused him when they reshackled him to the cell. During the three hour cleanup process Lunsford and Upham were able to remove their hands from the shackles. After the guards noticed the two inmates standing with their hands free, they attempted to correct the situation. Upham voluntarily allowed the guards to replace his hands in the shackles and was not injured. Lunsford, however, forcefully resisted attempts to return him to the shackles and was injured during the scuffle. Lunsford admits that he refused to be reshackled and received injuries as a result of his resistance. The officers did not strike or beat Lunsford, using only the amount of force necessary to reshackle him. This course of conduct does not evince any malicious or sadistic infliction of harm by defendants. Accordingly, Lunsford cannot sustain a claim for this harm under the Eighth Amendment.

■ Upham contends that he was subjected to cruel and unusual punishment when Officers Truex and Bennett poured a bucket of water over his head. But not every touch that an inmate finds offensive rises to the level of a constitutional violation. "The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, —— U.S. at ——, 112 S.Ct. at 1000, *quoting Whitley*, 475 U.S. at 327, 106 S.Ct. at 1088. The prisoners, including plaintiffs, had flooded the ward forcing prison officials to clean up the water to prevent water damage. Prisoners and guards were talking "trash" to one another and some prisoners were splashing the guards with water. Institutional security certainly was threatened by this disturbance and prison officials are obliged to restore order and control in these tumultuous situations. Pouring a bucket of water over the head of a prisoner who is already standing ankle-deep in water, while it may be seen as unnecessary in retrospect, is a minor use of force that does not offend the conscience. We do not advocate or condone the officers' conduct in this situation, but find that it does not rise to the level of a constitutional violation. The evidence, when viewed in the light most favorable to the plaintiff, does not support a finding of action repugnant to the conscience of mankind.

■ Moreover, we question whether Upham suffered any harm as a result of this incident. Though a significant injury is not required to establish cruel and unusual punishment, the degree of injury is relevant to determining "'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Hudson*, —— U.S. at ——, 112 S.Ct. at 999–1000. Upham claims he was hit in the head twice by the bucket. Since the incident occurred, he gets daily headaches, though these do not prevent him from working. He has not seen a doctor or received any medical attention for these pains. This type of minor injury further supports our conclusion that at most this incident was a *de minimis* use of force not intended to cause pain or injury to the inmate.

■ Finally plaintiffs argue that all of defendants' actions discussed above, including the conditions of confinement claims and the incidents that occurred during the flood, when viewed as a course of conduct over this three day period, establish subjective bad faith on the part of the officers and thus demonstrate a cognizable claim for Eighth Amendment violations. Reply Brief at 5. We find no merit in this argument. First, bad faith is not the standard for the subjective component of the test. Depending on the situation, "wanton" is defined using either a deliberate indifference or a malicious and sadistic standard. Second, this argument totally ignores the objective portion of

Eighth Amendment analysis. For these reasons we dismiss this argument under the reasoning discussed above.

### C. Due Process Claims

Stemming from the defendants' use of force against Lunsford and Upham on December 26, 1989, plaintiffs allege that the defendants' "intentional, unjustified, and excessive use of force constituted a deprivation of the plaintiffs' liberty without due process of law in violation of the Fourteenth Amendment." This allegation raises two possible deprivations: substantive due process rights and procedural due process rights. To the extent defendants could have violated plaintiffs' substantive due process rights, these rights are essentially coextensive with Eighth Amendment prohibitions against cruel and unusual punishment, and "where the deliberate use of force is challenged as excessive and unjustified," the Eighth Amendment serves as the primary source of protection for convicted prisoners. *Whitley*, 475 U.S. at 326–27, 106 S.Ct. at 1087–88. Because we find no cruel and unusual punishment in this case, there can similarly be no deprivation of substantive due process rights.

In *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court recognized several procedural safeguards applicable to individuals being held in correctional institutions. The Court held that the Due Process Clause of the Fourteenth Amendment entitled state prisoners to notice and some kind of hearing in connection with discipline determinations involving serious misconduct. But these pre-deprivation protections could not reasonably be applied to a prison disturbance situation where institutional security is threatened. Prison officials must be free to take appropriate action to maintain internal order and protect the safety of inmates and guards. *See Pell v. Procunier*, 417 U.S. 817, 823, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Bell v. Wolfish*, 441 U.S. 520, 546–47, 99 S.Ct. 1861, 1877–78, 60 L.Ed.2d 447 (1979) ("Prison administrators ... should be accorded a wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"),[5] and due process does not require that a hearing be held before applying necessary and justifiable force in a prison disturbance situation. Plaintiffs do not present any serious argument against this conclusion and we find that this claim is essentially just a recharacterization of the Eighth Amendment arguments we discounted above.

### D. State Constitution Violations

Because we find that the district court properly granted summary judgment

---

5. Here we note that, in what was otherwise a well-reasoned opinion, the district court correctly concluded that no procedural due process right was violated, but for the wrong reasoning. The district court explained,

[i]f procedural due process notions were viable in these situations, those procedures would certainly have to be post-deprivation procedures such as those enunciated in *Parratt v. Taylor*, 451 U.S. 527 [101 S.Ct. 1908, 68 L.Ed.2d 420] (1981), and *Hudson v. Palmer*, 468 U.S. 517 [104 S.Ct. 3194, 82 L.Ed.2d 393] (1984). While the post-deprivation remedies outlined in *Parratt, Palmer*, and progeny provide the only basis for procedures in these situations, it is well-established that *Parratt* does not apply to violations of substantive constitutional guarantees. *See Guenther v. Homgreen* [*Holmgreen*], 738 F.2d 879, 882 (7th Cir. 1984), *cert. denied*, 469 U.S. 1212 [105 S.Ct. 1182, 84 L.Ed.2d 329] (1985). Therefore, since the plaintiffs have obviously asserted

Eighth Amendment claims, there is no basis for consideration of a procedural due process claim.
Mem. op. at 25–26.

The district court misread *Guenther*. *Parratt* recognized two different types of claims under § 1983: substantive constitutional violations and procedural due process violations. The Court held that available state law remedies provided adequate relief for the alleged due process violation from the negligent loss of property by state officials such that plaintiffs had no cognizable § 1983 action. *Parratt*, 451 U.S. at 543–44, 101 S.Ct. at 1916–17. As recognized by this court in *Guenther, Parratt* does not apply to substantive due process violations. This does not mean, as the district court mistakenly concluded, that where a plaintiff asserts a substantive constitutional violation, they cannot also assert a procedural due process violation. A plaintiff may assert both claims, but *Parratt* only applies to the procedural due process claim.

in defendants' favor on both the Eighth and Fourteenth Amendment claims, we also affirm its decision to decline jurisdiction over plaintiffs' state law claims.

We find that there are insufficient facts in the record for the plaintiffs to maintain a cognizable claim under 42 U.S.C. § 1983, and, accordingly, the district court's judgment is

AFFIRMED.