**Cedric HAMILTON, Plaintiff,**

v.

**Howard A. PETERS, II, Henry Sutton, Melody Ford, Steve Godlock, and Calvin Drew, Defendants.**

No. 94 C 3193.

United States District Court,
N.D. Illinois,
Eastern Division.

March 19, 1996.

Robert C. Yelton, III, Dowd & Dowd, Ltd., Chicago, IL, for plaintiff.

Cedric Hamilton, Chicago, IL, Pro Se.

Joel Cabrera, Attorney General's Office, Chicago, IL, for defendants.

## *MEMORANDUM OPINION AND ORDER*

PLUNKETT, District Judge.

This case is before the Court on the defendants' motion for judgment on the pleadings. Plaintiff Cedric Hamilton ("Hamilton"), a prisoner in the custody of the Illinois Department of Corrections ("IDOC") who was once in a work release program, has sued the defendants under 42 U.S.C. § 1983 for alleged violation of his fourth and eighth amendment rights. For the reasons set forth below, we grant the motion on the issue of qualified immunity, and we therefore grant judgment in favor of the defendants on all claims.

### *Facts*

Hamilton is an inmate in the custody of IDOC. Defendant Howard A. Peters II is the former director of IDOC. Defendant Calvin Drew ("Drew") is a Senior Public Service Administrator at the Westside Community Correctional Center ("WCCC"), while defendants Steve Godlock ("Godlock") and Melody Ford ("Ford") are correctional counselors there. Defendant Henry Sutton ("Sutton") is a correctional residents counselor at WCCC.

In September 1993, Hamilton was assigned to the IDOC work release program at WCCC. On the morning of September 24, 1993, he was notified that a prison disciplinary ticket had been issued charging him with several rules violations connected with the

theft of cigarettes from a vending machine a week earlier. Shortly thereafter, he received a copy of the investigation report, which had been written by defendant Sutton. He waived the twenty-four hour notice requirement on the disciplinary hearing, and the institutional adjustment committee convened at 2:30 p.m. that day, at the direction of defendant Drew. The committee was composed of defendants Godlock and Ford. Hamilton was found guilty of all charges.

As a result of these disciplinary infractions, Hamilton's work release status was revoked, and he was transferred to Joliet, a maximum security facility. He remained there for about four weeks, sharing a cell with an inmate who smoked and receiving only minimal toiletries and infrequent showers. Then he was transferred to the Henry Hill Correctional Center ("Hill") in Galesburg, Illinois.

On October 13, 1993, Hamilton filed a grievance to appeal the disciplinary committee's actions. On October 21, 1993, Hamilton received a copy of the written conclusions of the disciplinary committee at WCCC. The report stated that the committee's determination of guilt was based upon "confidential information received from confidential sources and conflicting statements received from resident, and the report as written. Information about confidential witness are [sic] kept in chief of security office." (Compl. at 8.)

On December 13, 1993, Hamilton appeared before IDOC's administrative review board at Hill. On February 4, 1994, he received the review board's findings, which recommended that the disciplinary ticket be remanded to WCCC to be rewritten and reheard. On March 25, 1994, Hamilton was given a subsequent hearing at Hill, at which he requested assistance to prepare a defense, including the presentation of witnesss. He did not indicate his innocence or guilt at the time. He alleges that he was told by the chairperson that the warden would be informed of his continuance request and that he would be notified later of a new hearing date. Instead, two days later, he was informed that he had been found guilty of the charges in the rewritten ticket and that the

WCCC disciplinary committee's actions had been upheld.

Hamilton filed this action *pro se* on May 24, 1994. He asserts that the defendants' conduct violated his due process rights because he was not allowed to present the testimony of any witnesses on his own behalf (other than his own) at the disciplinary hearing at WCCC and because the disciplinary committee relied upon information obtained from a confidential informant. He also asserts that the revocation of his work release status and the failure of the administrative review board to grant him a continuance on the rewritten disciplinary ticket violated his due process rights. Finally, he contends that the conditions of his confinement while at Joliet violated the eighth amendment's prohibition against cruel and unusual punishment. Hamilton does not seek transfer back to WCCC; rather, he requests damages in the amount of $2,500,000 from each of the defendants in their official capacities.

### *Discussion*

■ A motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is subject to the same standard as a motion brought under Rule 12(b)(6). *Alexander v. City of Chicago*, 994 F.2d 333, 335 (7th Cir.1993) (citing *United States v. Wood*, 925 F.2d 1580, 1581 (7th Cir.1991)). Thus, a motion for judgment on the pleadings will be granted only if " 'it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief.' " *GATX Leasing Corp. v. National Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir.1995) (quoting *Thomason v. Nachtrieb*, 888 F.2d 1202, 1204 (7th Cir. 1989)). And, as with a motion under Rule 12(b)(6), we must "view the facts ... in the light most favorable to the nonmoving party." *Id.* (citing *Craigs, Inc. v. General Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir.1993)).

The defendants have raised a number of issues in their motion. First, they assert that the disciplinary committee's action did not affect the duration of Hamilton's sentence and so did not implicate a liberty interest that required procedural protections. Second, they argue that none of the condi-

tions of Hamilton's confinement at Joliet rose to the level of a constitutional violation and that Hamilton has failed to show that the defendants acted with deliberate indifference. Third, they contend that Hamilton has failed to allege that any of the defendants had any involvement in the conditions of his confinement at Joliet or that Peters, Sutton and Drew had any personal involvement in the alleged due process violation at WCCC. Fourth, they contend that they are all entitled to qualified immunity. Lastly, they assert that Hamilton's claims for damages are barred by the eleventh amendment.

■■ We consider first whether the defendants are entitled to qualified immunity. The doctrine of qualified immunity protects governmental officials engaged in discretionary functions from suit "as long as their conduct does not violate a 'clearly established' constitutional right 'of which a reasonable person would have known.'" *Gregorich v. Lund,* 54 F.3d 410, 413 (7th Cir.1995) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). To determine if the defendants are entitled to qualified immunity, we must consider first whether Hamilton has alleged adequately a violation of a constitutional right and then whether the applicable constitutional standards were clearly established at the time of the alleged violation. *See id.* Thus, we address first the question of whether Hamilton has alleged a constitutional violation.

### I. *Fourth Amendment Claims*

■ Hamilton claims that the WCCC disciplinary committee's action in revoking his work release status violated his due process rights. The defendants argue that it did not because it did not exceed the expected scope of his sentence, which, they contend, dooms his claim under *Sandin v. Conner,* — U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Hamilton counters that it did because it resulted in his transfer to a maximum security facility which allows him significantly less personal freedom than work release did. Underlying Hamilton's argument is the claim that he had a liberty interest in his work release status.

■ To state a claim under section 1983, a plaintiff must show that the state deprived him of a constitutionally protected interest in life, liberty or property without due process of law. *Williams v. Ramos,* 71 F.3d 1246, 1248 (7th Cir.1995) (citing *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990)). There are no cases in this circuit deciding the precise question of whether a prisoner has a liberty interest in remaining on work release status. However, in *DeTomaso v. McGinnis,* 970 F.2d 211 (7th Cir.1992), the Seventh Circuit held that a prisoner has no liberty interest in obtaining an initial assignment to a work release program, noting:

> States may move their charges to any prison in the system. Community correctional centers are low security institutions but still prisons, and inmates have no more claim to be sent there than they have to avoid commitment to maximum-security penitentiaries.

*Id.* at 212. But *DeTomaso* was concerned with eligibility for work release programs, not the circumstances under which such work release status might be revoked.

The defendants assert that *Sandin v. Conner,* — U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), controls our analysis on the existence of a liberty interest, and to this extent they are correct. In that case, the Supreme Court made clear that the courts are to look to the nature of the deprivation suffered by a prisoner, not to the language of prison regulations, to determine if a liberty interest exists. *Id.* at ——-——, 115 S.Ct. at 2299–2300. The Court restricted prisoners' state-created liberty interests to "freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at ——, 115 S.Ct. at 2300. In analyzing whether the state of Hawaii had violated Conner's liberty interest when it placed him in disciplinary segregation for thirty days, the Court compared the conditions of life in segregation to the conditions of life in the gen-

eral prison population and determined that there were relatively few privileges enjoyed by the general prison population that were denied to prisoners in segregation. *Id.* at ——, 115 S.Ct. at 2301. On that basis, the Court concluded that placing Conner in disciplinary segregation for thirty days "did not work a major disruption in his environment." *Id.*

In *Sandin,* the Supreme Court reaffirmed its approach in *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), in which it had addressed whether a prisoner had a liberty interest in being assigned to a particular penal facility, or, in other words, in avoiding transfer to another prison with a less hospitable environment. *Sandin,* —— U.S. at ——, 115 S.Ct. at 2300. In *Meachum,* the Court held that not every "change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause." 427 U.S. at 224, 96 S.Ct. at 2538. The Court found that the prison regulations at issue afforded prison officials discretion to transfer prisoners "for whatever reason or for no reason at all." *Id.* at 228, 96 S.Ct. at 2540.

■ The defendants argue that *Sandin* allows us to consider only whether the expected scope of Hamilton's sentence was affected by the disciplinary action. We disagree, for we do not read *Sandin* so narrowly. Neither does the Seventh Circuit. In *Whitford v. Boglino,* 63 F.3d 527 (7th Cir.1995) (per curiam), the Seventh Circuit interpreted *Sandin* as recognizing, in essence, two sources for liberty interests: those created by the states through statutes or regulations, which " 'will be generally limited to freedom from restraint which ... imposes .[an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life,' " *id.* at 531 (quoting *Sandin,* —— U.S. at ——, 115 S.Ct. at 2300), and those existing independently of state regulations, which are limited to showing "that the infringement

of [an inmate's] liberty exceeded the expected scope of his sentence." [1] *Id.* at 531, n. 5 (citing *Sandin,* —— U.S. at —— ——, 115 S.Ct. at 2299–2300).

*Whitford* is instructive for another reason as well. In it, the Seventh Circuit rejected Whitford's claim that a disciplinary transfer to a maximum security prison from a facility with less stringent security violated his due process rights, citing *Meachum.* 63 F.3d at 532. The Seventh Circuit noted that, just as in *Meachum,* a prisoner in Illinois may be transferred even without being convicted of a disciplinary infraction; therefore, the court reasoned, a prisoner "may not contest his transfer on the ground that his conviction violated due process." *Id.* at 532–33.

While neither *DeTomaso* nor *Whitford* alone resolves the question presented by this case, together they make the answer clear. Hamilton had no liberty interest in obtaining his original assignment to work release under *DeTomaso,* and he had no liberty interest in remaining at any particular prison facility, or at a facility of any particular security level, under *Whitford.* Under these circumstances, we cannot see how Hamilton could have a liberty interest in avoiding a disciplinary transfer from a work release facility to a more secure facility.

■ Hamilton cannot state a claim for the violation of his fourth amendment rights on these facts. And, because his due process claim regarding the administrative review board's action also depends upon the existence of a liberty interest in work release, that claim fails as well. Therefore, we do not reach the second step of the qualified immunity analysis. The defendants are entitled to qualified immunity, and we grant judgment in their favor on Hamilton's fourth amendment claims.

## II. *Eighth Amendment Claim*

■ Hamilton's remaining constitutional claim is that the conditions at Joliet violated his eighth amendment rights. Specifically, he claims that his assignment to a double cell

---

1. Exceeding the scope of an inmate's sentence is not limited to the duration of incarceration; it may also arise where an inmate is involuntarily subjected to medical treatment, such as the administration of antipsychotic drugs. *Whitford,* 63 F.3d at 531, n. 5 (citing *Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036–37, 108 L.Ed.2d 178 (1990)).

with a cellmate who smoked, the provision of only minimal toiletries, and the denial of regular showers for a period of twenty-eight days constituted cruel and unusual punishment.

 To state an eighth amendment claim, a plaintiff must allege that the prison officials, on a subjective level, acted with deliberate indifference, and that the wrongdoing was, on an objective level, sufficiently harmful to establish a constitutional violation. *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir.1994). We address the latter issue first. "The objective analysis focuses on the nature of the defendants' acts, and whether the conditions [the prisoner was] forced to endure exceeded contemporary bounds of decency of a mature, civilized society." *Id.* Where an eighth amendment claim concerns conditions of confinement, the prisoner must demonstrate that he suffered a deprivation of the " 'minimal civilized measure of life's necessities.' " *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)).

The Seventh Circuit has held that the exposure of an asthmatic prisoner to secondhand smoke from a cellmate for a limited period of time does not establish a constitutional violation. *Oliver v. Deen*, 77 F.3d 156, 159 (7th Cir.1996). Similarly, requiring a prisoner to share a cell does not violate the eighth amendment. *Rhodes v. Chapman*, 452 U.S. 337, 348, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981). And, denying a prisoner regular showers and ample supplies of toiletries for a finite period, such as twenty-eight days, does not demonstrate a deprivation of the "minimal civilized measure of life's necessities." *See Harris v. Fleming*, 839 F.2d 1232, 1235–36 (7th Cir.1988). Thus, Hamilton cannot state a claim for violation of his eighth amendment rights on these facts. Again, we do not reach the second step of the qualified immunity analysis. The defendants are entitled to qualified immunity on Hamilton's eighth amendment claim, and we grant judgment in their favor on it.

### Conclusion

For the reasons set forth above, we grant the defendants' motion for judgment on the pleadings on the grounds that they are entitled to qualified immunity, and we grant judgment in their favor on all claims. This order is final and appealable.