99 F.3d 1142
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Rudolph L. LUCIEN, Plaintiff-Appellant,
v.
Richard B. GRAMLEY, and Howard A. Peters III, Defendants-Appellees.
 No. 94-3725.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 1, 1996.
Decided Oct. 10, 1996.
 
 Before CUMMINGS, COFFEY and EVANS, Circuit Judges.
 
 ORDER
 
 1
 Rudolph Lucien filed this suit pursuant to 42 U.S.C. § 1983, seeking damages[1] for Eighth and Fourteenth Amendment violations related to the conditions of confinement during a three-month period in 1993 he spent at Pontiac Correctional Center in Illinois. Plaintiff alleged cruel and unusual punishment based on defendants' (1) failure to enforce rules regarding noise level; (2) lack of personal hygiene items; and (3) facilitating and encouraging gang-related extortion activity. The parties filed cross-motions for summary judgment, and the district court entered summary judgment in favor of defendant Gramley, having previously dismissed defendant Peters for failure to prove personal involvement.[2]
 
 
 2
 Summary judgment is proper where the pleadings, depositions, affidavits, and admissions on file show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). We review the district court order granting summary judgment de novo, viewing all facts in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).
 
 
 3
 To establish liability for deliberate indifference based on the conditions of confinement under the Eighth Amendment, an inmate must show that the condition in question caused a sufficiently serious harm or risk of harm and that prison officials knew of the existing harm or the risk of harm. Farmer v. Brennan, 114 S.Ct. 1970, 1977 (1994). Penal conditions "may not deprive inmates of the minimal civilized measure of life's necessities." Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir.1988).
 
 Noise Level
 
 4
 Allegations of excessive noise in a prison can support a valid Eighth Amendment claim. See, e.g., Kost v. Kozakiewicz, 1 F.3d 176, 180 (3d Cir.1993) (section 1983 challenge to conditions of confinement, including allegations of unbearable noise pollution causing inmates to suffer degenerative hearing, should not have been dismissed on ground that issues were addressed in context of previous class action suit); Inmates of Occoquan v. Barry, 844 F.2d 828, 848 (D.C.Cir.1988) (excessive noise caused by unregulated television volume settings constituted constitutional violation only in combination with numerous other systemic deficiencies; proper to base holding on testimony that it was "necessary to almost shout to be heard"); Williams v. Boles, 841 F.2d 181, 183 (7th Cir.1988) (incessant noise may cause agony even though it leaves no physical marks); Toussaint v. McCarthy, 801 F.2d 1080, 1110 (9th Cir.1986) (affirming scope of relief granted by district court for noise level in the prison; evidence showed that there was a "constant level of noise" which adversely affected the inmates' hearing).
 
 
 5
 In this case, however, the allegations in the complaint and the materials submitted in the summary judgment proceeding establish that defendants are entitled to judgment. The complaint alleges that "the noise level throughout Pontiac is dangerously high, deafening and maddening at all times of the day, night and early morning hours,"[3] and that the staff fails to enforce rules related to noise levels, such as the rule that inmates use earphones for radios and televisions. As a result, plaintiff's "level of tension and psychological distress' increased and he experienced "frequent headaches resulting in pain."
 
 
 6
 Plaintiff attached his own affidavit to his motion for summary judgment, stating that he has observed inmates being allowed to "operate their audio-visual equipment as loud as they wish without intervention by staff, resulting in a noise condition that was always extremely loud and which frequently prevented sleep." Plaintiff later filed an additional affidavit stating: "I estimate that the typical average daytime noise level in the East Cellhouse is in the range of 85 to 95 decibels, a level that can be linked to nearly the sound and noise of a typical rock concert." At his deposition, plaintiff testified that his estimation was based on his "familiarity with discotheques and rock concerts and my familiarity with the literature surrounding noise."
 
 
 7
 Plaintiff also attached an affidavit from another inmate, Larry Pondexter, stating that inmates were allowed to "operate their audio-visual equipment as loud as they wish without intervention by staff." An affidavit of Jack Newsome, an inmate at Pontiac from November 1993 through February 1994, includes the same statement.
 
 
 8
 Defendants submitted affidavits of prison officials stating that the noise level is not excessive, describing the system for monitoring the noise level, and reporting that no complaints have been made by the inmates. Guards patrol the area to ensure compliance with earplug and noise rules. The unit superintendent states: "Correctional Officers assigned to East Cellhouse assure inmates' compliance with earplug and noise rules. Inmates not complying have their audio-visual equipment confiscated and receive a disciplinary ticket." Also, some inmates have no audio-visual equipment because such privileges are given only after the inmate has been in segregation for 60 days. The prison officials' affidavits also state that no excessive noise complaints were received from Lucien or other inmates during the period of July through October 1993. See Givens v. Jones, 900 F.2d 1229, 1234 (7th Cir.1993) (prison officials did not receive grievances about excessive noise from other inmates).
 
 
 9
 In order to state a successful claim, the risk of injury due to the noise conditions must be "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling v. McKinney, 113 S.Ct. 2475, 2482 (1993). Lucien's speculative and unsupported assertions fall far below this standard, and are insufficient to withstand defendants' motion for summary judgment. See Lunsford v. Bennett, 17 F.3d 1574, 1580 (7th Cir.1994) (affirming summary judgment for prison officials who allegedly subjected prisoners to loud noises over an intercom during a 24-hour period; "[t]he record contains no evidence that the noise levels posed a serious risk of injury to the plaintiffs. Subjecting a prisoner to a few hours of periodic loud noises that merely annoy, rather than injure the prisoner does not demonstrate a disregard for the prisoner's welfare"); Murphy v. Dowd, 975 F.2d 435, 437 (8th Cir.1992) (per curiam ) (affirming judgment for prison officials, finding excessive noise claim was meritless); Givens v. Jones, 900 F.2d 1229, 1234 (8th Cir.1990) (affirming summary judgment for prison officials in suit alleging excessive noise caused by remodeling in prison; court finds noise is "a fact of life" and that the claim "on its face appears almost specious"; inmate failed to claim the noise was result of malicious intent or even reckless disregard for his well-being); Wilson v. Seiter, 893 F.2d 861, 867 (6th Cir.1990) (affirming summary judgment for prison officials in suit where inmates complained of excessive noise levels; defendants' uncontradicted affidavits were not sufficiently countered by plaintiffs to show that defendants were violating Eighth Amendment; "at best, [the inmates'] claim evidences negligence ... in implementing standards for maintaining conditions"); Peterkin v. Jeffes, 855 F.2d 1021, 1027 (3d Cir.1988) ("the noise in the cells, while it may be irritating to some prisoners, cannot fairly be said to inflict cruel and unusual punishment"); Spivey v. Doria, No. 91 C 4169 (N.D.Ill. March 24, 1994), 1994 WL 97756 at * 11 (finding no constitutional violation where inmate only alleges that noise level caused him to lose sleep and made him irritable; "Federal courts are not the forums to determine proper lighting and noise levels in jails").
 
 
 10
 In addition, Lucien's estimate of the decibel level would not be admissible at trial, and thus cannot serve to adequately counter defendants' summary judgment motion. See Fed.R.Civ.P. 56(e) (affidavits shall be made on personal knowledge and shall set forth facts that would be admissible in evidence); Winskunas v. Birnbaum, 23 F.3d 1264, 1267-68 (7th Cir.1994) (to ward off summary judgment, plaintiff must present materials containing factual content that is of evidentiary quality and that demonstrates the existence of a genuine issue of material fact). There simply is no support for plaintiff's speculation that the noise level reached 85-95 decibels. Lucien did not, for example, use a mechanical device, and admits having no particular expertise in evaluating decibel levels. Nor does he submit medical evidence indicating any damage to his health as a result of the noise.
 
 
 11
 Lucien also testified at his deposition that he had complained about the noise to prison officials and had repeatedly filed grievances about excessive noise. He also "spoke directly with Warden Gramley several times about the noise." Defendant denies this. Even if Lucien's version is true, however, the fact that he complained about the noise level is not enough to create a genuine issue of material fact, since there is no evidence of a noise level so excessive as to constitute a constitutional violation.
 
 Personal Hygiene Items
 
 12
 Plaintiff alleges that while in segregation he was denied "soap, toothbrush, toothpaste, toilet paper and washcloth, and furnished filthy bedding and a filthy cell overrun by roaches, combined with an absence of pest control service and cleaning supplies." The deprivations were temporary. One involved a delay of only 24 hours when he first arrived at Pontiac. (At his deposition, Lucien testified that he arrived at Pontiac on July 22, 1993, but did not receive toothpaste, toothbrush, or soap until the next day.) The other claim involved a delay of five or six days when he was transferred to segregation.
 
 
 13
 These types of temporary delays in providing personal hygiene items do not violate the constitution. See Lunsford v. Bennett, 17 F.3d at 1580 (24-hour delay in providing hygiene supplies is not the type of extreme deprivation required to establish an objective violation of the Eighth Amendment); Harris v. Fleming, 839 F.2d 1232, 1235-36 (7th Cir.1988) (confinement in a "filthy, roach-infested" cell without articles of hygiene for five to ten days did not violate the Eighth Amendment); Johnson v. Pelker, 891 F.2d 136, 138-39 (7th Cir.1989) (unpleasantness of prison conditions were relatively temporary); see also Bono v. Saxbe, 620 F.2d 609, 613 (7th Cir.1980) (generally harsher conditions in segregation do not violate the Eighth Amendment).
 
 Gang-Related Activity
 
 14
 Plaintiff alleges that when he first entered the East Cellhouse orientation unit, he observed linen bearing gang-related colors and emblems "hanging from the front of cells." Both staff and inmates told him that if he would not affiliate with a gang, he would have to pay rent to a gang in order to live in a cell in the general prison population. When he refused housing in the East Cellhouse, plaintiff was taken to the segregation unit, and he was repeatedly subjected to disciplinary actions for his continued refusal to be housed in the East Cellhouse. Plaintiff attached his own affidavit to his motion for summary judgment, stating he refused to accept assignment to the general prison population because he believed he would be in "grave physical danger from gang member inmates."[4] The affidavit also stated that plaintiff had observed gang members hanging gang material in the front of their cells, without intervention from staff. Lucien attached newspaper articles describing Pontiac as a battleground.
 
 
 15
 Plaintiff also submitted an affidavit from another inmate, Larry Pondexter, stating that "a majority of the inmates are members of prison gangs and the prison gangs are being allowed by staff to claim ownership of all cells in the general prison population." An affidavit of Jack Newsome, an inmate at Pontiac from November 1993 through February 1994, states the same. Plaintiff attached an affidavit from inmate Clayton Rockman, who was incarcerated at Pontiac from September 1983 to October 1992. In August 1992, several gang members claimed ownership of Rockman's assigned cell, and beat him severely.
 
 
 16
 Affidavits submitted by defendants indicate that if any inmate had complained of extortion attempts, prison officials would have immediately investigated the report, and such misconduct would have been disciplined. Notwithstanding Lucien's affidavits stating the contrary, Lucien admitted during his deposition testimony that he did not report any extortion threat. We generally give more weight to depositions than affidavits. See Darnell v. Target Stores, 16 F.3d 174, 176 (7th Cir.1994); Bank Leumi Le-Israel v. Lee, 928 F.2d 232, 237 (7th Cir.1991); Adelman-Tremblay v. Jewel Companies, Inc., 859 F.2d 517, 520 (7th Cir.1988); Babrocky v. Jewel Food Co., 773 F.2d 857, 861 (7th Cir.1985). This is because depositions "carry an increased level of reliability," since they are "adversarial in nature and provide the opportunity for direct and cross-examination." Darnell, 16 F.3d at 176. A party "should not be allowed to create issues of credibility by contradicting his own earlier testimony." Babrocky, 773 F.2d at 861 (internal quotation marks omitted).
 
 
 17
 Lucien testified that he never had a conversation with defendant concerning the gang extortion or presence ("No, I haven't"), except perhaps for general comments concerning gang colors hung on cell doors. He could not recall the content of the comments: "I don't recall any of the specifics of the conversation I had with Warden Gramley."
 
 
 18
 Specifically in regard to the extortion claim, Lucien testified that when he arrived at Pontiac, a man approached him and mentioned that if an inmate had no gang affiliation he had to pay rent. "I was told, upon arrival, after announcing that I was not a gang member, that I would have to pay rent to live in the general prison population at Pontiac Correctional Center." But he did not threaten Lucien: "He did not threaten me. I don't think he threatened me." Instead, it was just one inmate "informing me of the conditions of confinement at the Pontiac Correctional Center upon my arrival." There were no further requests for rent. Lucien never reported the extortion conversation.
 
 
 19
 Q. Did you report the request for rent to anybody in a grievance?
 
 
 20
 A. I don't know. I may have.
 
 
 21
 Q. You may have. Do you have any documentation to that effect?
 
 
 22
 A. I don't know.
 
 
 23
 Q. Who did you--
 
 
 24
 A. Probably have.
 
 
 25
 Q. Did you tell anybody in person?
 
 
 26
 A. Yes.
 
 
 27
 Q. Who did you tell that you had just been asked to pay rent for a cell? What--
 
 
 28
 A. In person, no.
 
 
 29
 Q. No. Okay.
 
 
 30
 A. Not in person.
 
 
 31
 * * *
 
 
 32
 * * *
 
 
 33
 Q. * * * Why didn't you tell anybody?
 
 
 34
 A. I don't know.
 
 
 35
 By his own admission, then, Lucien never reported the incident. Cf. Farmer v. Brennan, 114 S.Ct. 1970, 1982 (1994) ("prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment").
 
 
 36
 In addition, Lucien does not allege that he was ever attacked or otherwise harmed by gang members. He maintains that he just generally finds the presence of gangs in prison to be intimidating. True, he does not need to suffer actual physical injury as a prerequisite to bringing a "failure to protect" claim. However, Lucien has not shown that he was even the victim of threats. While he need not be physically harmed in order to sustain a claim of failure to protect, there must be something more than an isolated, remote warning--for example, repeated threats sometimes described as a "reign of terror"--to support the claim. Cf. Walsh v. Brewer, 733 F.2d 473, 476 (7th Cir.1984) (while the guarantee against cruel and unusual punishment is generally implicated only when an inmate suffers physical injury, "risks to an inmate's safety alone may violate his rights when the threats are so constant that a virtual 'reign of terror' exists"). And, while Lucien submitted a record of assaults at Pontiac between January 1992 and April 1994, there is nothing indicating which assaults were gang-related, and apparently none of the incidents involved Lucien.
 
 
 37
 Pontiac, like many prisons, has a history of gang-related violence. See, e.g., David K. v. Lane, 839 F.2d 1265 (7th Cir.1988) (affirming denial of injunctive relief in inmates' class action against Pontiac prison officials alleging equal protection violations triggered by prison's permitting gang membership). Lucien correctly points out that various Pontiac inmates have filed lawsuits about the gang-related control of the facility. Nevertheless, on the record that Lucien presents to us in this case, he cannot withstand a summary judgment motion.
 
 
 38
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 In regard to injunctive and other equitable relief at Pontiac, Lucien refers us to his participation in the class action Inmate A v. Howard Peters, No. 89-2047 (C.D.Ill.1989), which involved conditions at Pontiac. A consent decree was entered in Inmate A on March 15, 1995 in the district court, and a monitor reports regularly to the district court about the prison's compliance with the decree
 
 
 [2]
 Because we find no constitutional violations, we need not address the issue of whether Peters was properly dismissed for lack of personal involvement
 
 
 [3]
 Lucien sometimes refers to the noise "throughout Pontiac," and sometimes restricts his allegations to the areas in which he was housed
 
 
 [4]
 In his deposition testimony, Lucien refers to a gang-related "hit" on him, but he could not remember whether or not he informed the prison officials about the threat. He later testified, however, that he did inform prison officials when, upon his arrival at Pontiac, he heard unknown inmates shouting at him, "We got a hit on you, man."