**UNITED STATES of America**

v.

**Alan Barton NACHAMIE, et al., Defendants.**

**No. S3 98 CR. 1238(SAS).**

United States District Court, S.D. New York.

Sept. 22, 2000.

Jonathan N. Halpern, Robert R. Strang, Erika K. Thomas, United States Attorney's Office, New York City, for the United States of America.

James E. Neuman, Mischel, Neuman & Horn, P.C., New York City, for Ghanshyam Kalani.

Richard A. Tanner, Dickson, Ashenfelter, Slous, Tanner & Trevenen LLP, Upper Montclair, NJ, for Donna Vining.

Robert S. Fink, Kostelanetz & Fink, LLP, New York City, for Kenneth Schrager.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

On May 9, 2000, following a lengthy jury trial, defendants Ghanshyam Kalani, Kenneth Schrager and Donna Vining (the "defendants") were convicted of one count of participating in a scheme to defraud Medicare, in violation of 18 U.S.C. §§ 1347 and 2, one count of making false statements in matters involving the Medicare program, in violation of 18 U.S.C. §§ 1035 and 2, and five counts of submitting false claims to Medicare, in violation of 42 U.S.C.

§ 1320a–7b(a)(5) and 18 U.S.C. § 2. In anticipation of their upcoming sentences, the Probation Department has prepared Presentence Reports ("PSRs") for each defendant. The Government and each defendant have reviewed the PSRs and filed their objections, to which the Probation Department has responded.

While there are a number of sentencing issues unique to each defendant, four issues are common to all: (1) loss calculation; (2) role in the offense; (3) whether their criminal conduct falls outside the "heartland" of the fraud sections of the Sentencing Guidelines; and (4) restitution.[1] The parties fully briefed these issues in a series of letters submitted to the Court between August 1 and September 15, 2000, and the Court heard oral argument on September 13, 2000. See Transcript of Oral Argument of September 13, 2000 ("Tr."). Because these disputes raise relatively complicated issues, I shall address them now so that the parties may have the benefit of this decision prior to the sentencing.

## I. BACKGROUND

The defendants, each of whom is a doctor, were indicted together with six other defendants for their participation in a fraudulent billing scheme designed to defraud Medicare of millions of dollars. The background of this prosecution can be found in this Court's prior opinions. See *United States v. Nachamie, et al.*, 91 F.Supp.2d 552 (S.D.N.Y.2000) ("*Nachamie I*"); *United States v. Nachamie, et al.*, 91 F.Supp.2d 565 (S.D.N.Y.2000) ("*Nachamie II*"); *United States v. Nachamie, et al.*, 101 F.Supp.2d 134 (S.D.N.Y.2000) ("*Nachamie III*"). Nonetheless, a brief summary of the charges on which defendants were convicted is required.[2]

---

1. In addition to these four issues, Vining and Kalani have raised legal issues, or mixed questions of law and fact, that were fully briefed by both sides. I shall address these issues at the conclusion of my discussion of the four common issues. See infra Parts II. E.1–2 and II.F.

2. Two defendants pled guilty to one or more counts. The doctors were tried separately from the remaining defendants (the "non-doc-

## A. The Charges

Count One charged the defendants with conspiring, between 1995 and June 10, 1998, to violate the following laws: 18 U.S.C. §§ 1035, 1341 and 1347 and 42 U.S.C. §§ 1320a–7b(a)(2) and 1320a–7b(a)(5). The objects of the conspiracy included: (1) executing a scheme to defraud the Medicare program; (2) mailing various documents in furtherance of the scheme; (3) making false statements in connection with the delivery of and payment for health care benefits; (4) making false statements in order to obtain payments from private insurance carriers that administered the Medicare Program; and (5) presenting false claims to the Medicare program.[3] Kalani was acquitted on the conspiracy charge. The jury was unable to reach a verdict on this charge with respect to Schrager or Vining, and the Government has decided not to retry them.

Count Two charged all defendants with participating in a scheme to defraud Medicare in the same ways and means as described in Count One, in violation of 18 U.S.C. §§ 1347 and 2. Each of the defendants was convicted on Count Two.

Count Three charged Kalani and the non-doctor defendants with making false statements in matters involving the Medicare program, in violation of 18 U.S.C. §§ 1035 and 2. Kalani was convicted of Count Three. Both Vining and Schrager were convicted of the same charges in Counts Four and Five, respectively.

Counts Seven through Eleven charged some of the non-doctor defendants and Kalani with submitting false claims to Medicare, in violation of 42 U.S.C. § 1320a–7b(a)(5) and 18 U.S.C. § 2. Kalani was convicted of Counts Seven through Eleven. Both Vining and Schrager were convicted of the same charges in Counts Twelve through Sixteen and Seventeen through Twenty–One, respectively.

## B. The Proof

The Government offered proof at trial that the claims were false in one or more of the following five ways: (1) the claimed services were never rendered; (2) different services were rendered than those that were billed; (3) services were rendered at home but were claimed to have been rendered in an office; (4) services were rendered by unsupervised non-doctors, but were claimed to have been rendered by licensed doctors or by non-doctors under the supervision of a licensed doctor; and (5) services were rendered on a single date, rather than on the various dates claimed.

The proof at trial established, in general terms, that the scheme worked in the following manner. Defendants Alan Barton Nachamie and Lydia Martinez recruited telemarketers, who convinced elderly Medicare beneficiaries to agree to home visits. The beneficiaries were told that diagnostic tests would be performed, for the purpose of identifying those at risk for heart attacks, strokes and Alzheimer's Disease, as part of a health awareness program under the auspices of Medicare. Nachamie and Martinez then recruited foreign medical school graduates ("FMGs"), who were not licensed doctors in the United States, and physicians' assistants ("PAs") to conduct these home visits. During these visits, the FMGs took a brief medical history, performed a cursory examination and administered two basic tests—a cardiac rhythm test and a Doppler blood circulation test. The FMGs

---

tor defendants"). *See Nachamie III,* 101 F.Supp.2d at 151–52. The non-doctor defendants were convicted of one or more counts on August 2, 2000, and are scheduled to be sentenced in November.

**3.** Count One charged the non-doctor defendants with conspiring to violate the same laws and set forth the same objects of the conspira-

cy. Count One also charged only the non-doctor defendants with conspiring to violate 42 U.S.C. § 1320a–7b(b)(1)(A), alleging that another object of the conspiracy was to solicit or receive kickbacks for ordering and arranging for a medical laboratory to perform tests that were then billed to Medicare.

also obtained the beneficiary's Medicare number.

Finally, Nachamie recruited licensed doctors, including the defendants, to "supervise" the FMGs and PAs and review patient charts. The doctors rarely, if ever, met with the Medicare beneficiaries or the FMGs. Instead, Nachamie, Martinez and others provided the doctors with patient charts that included a brief medical history, the results of the simple tests performed during the perfunctory home visit, and "Encounter Forms" indicating the tests or services to be billed to Medicare. The doctors then signed the Encounter Forms as the ordering physicians, even though they had never examined the patients or personally supervised the FMGs. In fact, the tests were "ordered" by clerical workers, who checked the boxes on the Encounter Forms at random.

The Encounter Forms were sent to defendant Jose Hernandez and other billers, who submitted claims to Medicare by mail and electronically. The billing was done under the provider numbers of doctors and professional corporations, and Medicare providers sent checks to the doctors or professional corporations after processing the claims. At Nachamie's direction, the doctors deposited the checks, keeping 22% of the funds and writing checks for the remaining portion to Nachamie's corporations. Over ten (10) million dollars was billed to Medicare as a result of this conspiracy.

What follows are examples of services that were not performed or services that were billed in place of those that were performed: (1) billing for an "event recorder," which permits the monitoring and recording of the heart rhythm 24 hours a day for up to 30 days when, in reality, the patient received a one-to-two minute cardiac rhythm test; (2) billing for extensive Duplex blood circulation scans when, in reality, the patient received a less expensive Doppler blood circulation test; and (3) billing for echocardiograms and stress tests when, in reality, no such tests were given or were improperly given.

The evidence offered at trial included several facts that potentially mitigate the role played by the doctors in this scheme. *First*, the doctors initially were recruited through advertisements in respected newspapers. *Second*, signatures of the doctors were occasionally forged. *Third*, the Encounter Forms signed by the doctors contained codes rather than descriptions of the actual medical procedures. *Fourth*, the billers occasionally submitted bills to Medicare before the doctors signed the Encounter Forms. *Fifth*, the doctors often signed Encounter Forms before the codes and procedures were added. *Sixth*, Nachamie told a potential investor that the doctors had to be changed frequently to avoid detection by Medicare and that he was looking to recruit dumb, naive doctors.

## II. DISCUSSION

### A. Loss Calculation

Both the Government and the defendants agree that the fraud guideline governs the offense level calculation. *See* United States Sentencing Guidelines ("U.S.S.G.") § 2F1.1. This guideline sets a base offense level of six (6), which is enhanced by the amount of loss. *See* U.S.S.G. § 2F1.1(b)(1). The Government argues that the amount of loss should be based on the intended loss—here, the full amount billed to Medicare under a defendant's Medicare provider number. The defendants, in turn, argue that the amount of loss should be based on the actual loss sustained by Medicare as a result of the use of that doctor's provider number. In each case, the choice between the two approaches would result in a difference of two levels—from a ten-level to an eight-level adjustment for Schrager and Vining and from a nine-level to a seven-level adjustment for Kalani. *See* Tr. at 24–25, 31, 37–38. Two Application Notes to § 2F1.1 are particularly important for analyzing this issue. Application Note 8 states in relevant part:

Valuation of loss is discussed in the Commentary to § 2B1.1 (Larceny, Embezzlement, and Other Forms of Theft). As in theft cases, loss is the value of the money, property, or services unlawfully taken; it does not, for example, include interest the victim could have earned on such funds had the offense not occurred. Consistent with the provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy), *if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss.*

U.S.S.G. § 2F1.1, Application Note 8 (emphasis added). Application Note 9 states in full:

> For the purposes of subsection (b)(1), *the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.* This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.

U.S.S.G. § 2F1.1, Application Note 9 (emphasis added).

 There is little doubt that the Government bears the burden of proving: (1) defendant intended to inflict the loss; and (2) the amount of the intended loss. *See United States v. Jacobs,* 117 F.3d 82, 96 (2d Cir.1997) (presuming that Government bears burden of showing that the defendant "attempted to inflict the loss") (quotation marks and citation omitted); *see also United States v. Say,* 923 F.Supp. 611, 613–14 (D.Vt.1995) ("Because an offense level enhancement is sought, the Government bears the burden of proving by a preponderance of the evidence that Say attempted to inflict a loss totalling the aggregate credit limit of the cards."). Rely-

ing on the recent Supreme Court case of *Apprendi v. New Jersey,* —— U.S. ——, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), defendants argue that the Government must meet an enhanced burden of proof because the loss calculation has a significant impact on the sentence and the jury was not asked to decide the amount of loss. Defendants urge that the Government must prove the amount of the intended loss beyond a reasonable doubt.

 Defendants' argument is without support. *Apprendi* dealt with a sentencing enhancement that increased the potential sentence beyond the statutory maximum. *See id.* at 2362–63 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *see also Jones v. United States,* 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) ("[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt."); *United States v. Rebmann,* 226 F.3d 521, 524 (6th Cir.2000) ("Our duty, in light of this clear dictate from the Court, is to examine whether the sentencing factor in this case was a factual determination, and whether that determination increased the maximum penalty for the crime charged in the indictment."). In *United States v. Gigante,* 94 F.3d 53 (2d Cir.1996), the Second Circuit addressed the burdens of proof in the context of adjustments and departures. The court held that when considering adjustments and departures, particularly "multiple upward adjustments," a court may apply a heightened standard of proof. *See id.* at 56 ("Where a higher standard, appropriate to a *substantially enhanced sentence range,* is not met, the court should depart downwardly.") (emphasis added). Here,

setting the offense level by applying the fraud guideline is neither an adjustment nor a departure. In addition, the offense level determined by using an intended loss figure will not result in a substantial enhancement or in a sentence beyond the statutory maximum. For these reasons, the Government need only prove defendants' intent and the amount of intended loss by a preponderance of the evidence.

 Defendants argue that the loss they intended to inflict[4] cannot be determined for the following reasons: (1) they did not prepare the bills that were submitted to Medicare and were unaware of billing practices such as resubmitting paid bills; (2) they were unfamiliar with the procedure codes used by the Medicare providers in the remittance statements; (3) no one intended Medicare to pay the amounts billed; and (4) it is impossible to determine when they formed the criminal intent to defraud Medicare. *See* Letter of August 7, 2000 from Schrager's attorney to the United States Probation Department ("Schrager 8/7 Let.") at 3–6; Letter of September 11, 2000 from Schrager's attorney to the Court ("Schrager 9/11 Let."); Letter of September 1, 2000 from Vining's attorney to the Court ("Vining 9/1 Let.") at 4–5; Letter of August 8, 2000 from Kalani's attorney to the United States Probation Department ("Kalani 8/8 Let.") at 4–6; Letter of August 31, 2000 from Kalani's attorney to the Court ("Kalani 8/31 Let.") at 1–6; Letter of September 11, 2000 from Kalani's attorney to the Court ("Kalani 9/11 Let.") at 1–4; Letter of September 15, 2000 from Kalani's attorney to the Court ("Kalani 9/15 Let.") at 1–2; *see also* Tr. at

9–10, 21–29, 30–32. In addition, at least one defendant argues that the proof at trial revealed:

> bills were submitted using the doctors' Medicare numbers without first obtaining their signatures on the supporting documentation ... the supporting documentation was signed by a different doctor than the one whose Medicare number was used to submit the bill ... [and] the doctors' signatures were forged [on some forms].... [Finally,] bills were submitted even when [Kalani] refused to sign the encounter forms.

Kalani 8/31 Let. at 3 (citations omitted).

 Some of these arguments are easily rejected. While defendants did not prepare the bills and were unaware of Nachamie's fraudulent billing practices, such as double billing, and while they were unfamiliar with the billing codes, defendants received detailed remittance statements from the Medicare providers. *See* Government Exhibits ("GX") 423, 735, 1301, 1901. These remittance statements included the names of patients, the dates of service, the codes for the procedures billed, the amounts billed and the amounts paid. Defendants received these statements with each and every check. Even if they had no criminal intent when they first began to work for Nachamie, the very first remittance statement should have made the doctors suspicious of the fraudulent nature of the scheme.[5] In addition, several aspects of this scheme should have raised red flags of fraud—these doctors knew they saw no patients, they knew they ordered no tests, they knew that patients did not come to the clinic, they knew that no test results

---

4. Defendants, of course, maintain their innocence and do not admit that they intended to inflict any loss.

5. It is for this reason that I reject defendants' argument that it is impossible to determine when they formed the intent to cause a loss to Medicare. While this time cannot be precisely identified, it is unnecessary to do so. *See* U.S.S.G. § 2F1.1, Application Note 9, quoted *supra* at p. 291. The first remittance statement should have alerted defendants that they were

participating in a fraudulent scheme. Given their review of the patient charts and Encounter Forms, they should have known that the procedures billed for could not have been performed on the dates noted and in the quantities submitted. The dollar amounts sought per patient were completely inconsistent with the material they reviewed, which consisted of little more than a skimpy medical history and a report of vital signs and simple tests.

were reported to them and they knew that they provided no follow-up medical care. It is common knowledge that "you can't get something for nothing" and "money doesn't grow on trees". These doctors had to have suspected almost immediately that the billing submitted using their Medicare billing numbers was fraudulent. For the purpose of loss calculation, those suspicions amount to intent.

On the other hand, intended loss must mean what it says. *See Jacobs,* 117 F.3d at 95 (intended loss refers "to losses that might naturally and probably flow from the fraud"); *United States v. Oligmueller,* 198 F.3d 669, 671 (8th Cir.1999) ("[I]ntended loss 'means just ... the loss the defendant intended to cause to the victim.'") (quotation marks and citations omitted); *United States v. Blitz,* 151 F.3d 1002, 1009–11 (9th Cir.) (defendant's subjective intent shaped by his or her understanding of prevailing economic circumstances), *cert. denied,* 525 U.S. 1029, 119 S.Ct. 567, 142 L.Ed.2d 473 (1998); *United States v. Calhoon,* 97 F.3d 518, 530–31 (11th Cir. 1996) (loss was properly based on "potential reimbursement effect" from Medicare). The Government places great reliance on defendants' receipt of the remittance statements to support its argument that the defendants knew of the fraudulent scheme and intended to cause a loss to Medicare. The same evidence reveals, however, that the defendants knew that Medicare always reimbursed procedures at a fixed or "capped" rate per procedure. Thus, defendants' intent was that Medicare reimburse them, at Medicare's capped rate, for the procedures reflected in the submitted bills.

The Government construes defendants' argument as one of impossibility—that because Medicare does not pay more than a fixed rate per procedure it was impossible to pay the amount billed—and proceeds to knock down that straw man by arguing that impossibility of payment is not a defense. *See* Government's September 7, 2000 Letter to the Court ("Gov't 9/7 Let.") at 5–9 (citing, *e.g., United States v. Klisser,* 190 F.3d 34, 35 (2d Cir.1999)). The Government, however, confuses the concept of impossibility with that of intent. I find that the Government has not proved, by a preponderance of the evidence, that these defendants intended Medicare to pay more than its fixed rates. Because their knowledge of the Nachamie billing practices was primarily gained from a review of the remittance statements, they knew that Medicare would only reimburse them at fixed rates.[6]

I conclude that intended loss is a figure that "can be determined", albeit "not ... with precision." U.S.S.G. § 2F1.1, Application Notes 8 and 9. The intended loss figure is the capped amount that Medicare typically pays per procedure code, reduced by 20%.[7] The amount should be further reduced by the amount of any duplicate billing—namely bills that were paid but subsequently submitted again for payment. The Government has not proved that defendants intended to cause Medicare to

---

**6.** The Government argues that the billed claims consistently exceeded the amounts Medicare allowed, demonstrating that the defendants attempted to obtain the actual amounts billed. I disagree. It is common knowledge that Medicare and private insurers pay fixed rates for medical procedures. Nonetheless, legitimate medical providers continue to bill at their usual rates, despite these fee caps. The reasons for this can only be presumed. It is likely that doctors continue to bill in this way for two reasons. *First,* they can argue that the fixed fees should be raised to reflect their usual billing rates. *Second,* they can obtain their usual billing rates from private patients, not covered by Medicare or another capped insurance plan. These defendants were experienced physicians. To the extent they understood billing, they must have known, as most patients know, that Medicare and other insurers pay fixed rates despite the fact that the amounts billed are routinely higher than the amounts paid.

**7.** The Government has agreed that the loss figure should be reduced by the 20% co-pay ordinarily paid by the patient. *See* Gov't 9/7 Let. at 4 n. 4.

pay claims twice, despite the fact that defendants had access to this information through their receipt of the remittance statements. The volume of the statements received would have made it impossible to catch this type of billing fraud. It would be unfair to charge them with knowledge of this particularly greedy and sleazy conduct, which was not reasonably foreseeable. *See United States v. Greenfield,* 44 F.3d 1141, 1149 (2d Cir.1995) ("[A] defendant convicted for participation in a conspiracy is accountable in sentencing for 'all reasonably forseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.'") (quoting U.S.S.G. § 1B1.3). Accordingly, the Government and defendants are directed to calculate loss amounts in accordance with this ruling.[8]

### B. Role in the Offense

Section 3B1.2 of the Sentencing Guidelines states:

Based on the defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.

In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2. Schrager and Kalani argue that they are entitled to a two-level reduction because they played a minor role in Nachamie's scheme. Vining goes even further, arguing that she is entitled to a four-level reduction because she only played a minimal role.

■ "A defendant has the burden of proving by a preponderance of the evi-

dence her entitlement to a mitigating role downward adjustment under § 3B1.2." *United States v. Colon,* 220 F.3d 48, 51 (2d Cir.2000). This section was designed to "provide[ ] a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, Background. In order to merit a four-level adjustment, which should be used infrequently, the defendant must prove that he or she was "plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2, Application Note 1; *see also United States v. Gaston,* 68 F.3d 1466, 1468 (2d Cir.1995) (quoting Application Note 1); U.S.S.G. § 3B1.2, Application Note 2 ("It is intended that the downward adjustment for a minimal participant will be used infrequently."). To qualify for a two-level adjustment, the defendant must prove that he or she was "less culpable than most other participants." U.S.S.G. § 3B1.2, Application Note 3; *see also United States v. Ajmal,* 67 F.3d 12, 18 (2d Cir.1995) (quoting Application Note 3). In making its determination, a court must examine the defendant's culpability relative to the other participants in the crime for which he or she was convicted and average participants in the same crime. *See Ajmal,* 67 F.3d at 18 ("The fact that Ajmal played a minor role in his offense 'vis-a-vis the role of his co-conspirators' is insufficient, in and of itself, to justify a two level reduction; Ajmal must have similarly played a minor role in comparison to the average participant in such a drug crime.").

■ Defendants argue that they entered the scheme innocent of any criminal knowledge or intent. Indeed, witnesses at trial testified that the doctors were not

---

**8.** Just before releasing this Opinion and Order, I received a letter from the Government detailing the maximum amounts allowed by Medicare for the procedure codes fraudulently billed by defendants. *See* September 22, 2000 Letter from Assistant United States At-

torney Erika Thomas to the Court. The letter also included 80% of the maximum allowed amounts for each procedure. *See id.* This figure should be used to calculate the loss amounts—minus any resubmitted paid bills.

told of the illegal billing practices. In addition, these defendants played no role in establishing or operating the clinics, recruiting employees or patients, or submitting bills. There was also evidence that the doctors should be frequently replaced and were entirely fungible. Based on these arguments, defendants argue for a downward role adjustment.

The Government, in turn, argues that the doctors were essential to the scheme because they (1) signed the medical charts; (2) supplied their Medicare provider numbers; (3) received and deposited the checks from Medicare; and (4) returned the lion's share of the monies received to Nachamie and his clinics. In short, the Government argues that the doctors were central to the scheme because the scheme could not operate without complicit doctors. "[T]he Medicare program relies upon the trustworthiness of doctors who elect to participate in the Medicare program. The testimony from the Medicare witnesses at trial established that it is the doctors who are entrusted to maintain the program's integrity by submitting only accurate claims for medically necessary services." Gov't 9/7 Let. at 2 (citations omitted).

Defendants have failed to sustain their burden of proof. While the doctors were certainly less culpable than other participants in the Nachamie scheme, they were not substantially less culpable than the average participant in a Medicare fraud. *See United States v. Lopez*, 937 F.2d 716, 728 (2d Cir.1991) (intent of role adjustment is not to reward a defendant merely because his codefendants were even more culpable). As the Government persuasively argued, the scheme could not operate without doctors. They played an absolutely essential role. A doctor was necessary to sign off on charts, permit the use of a Medicare provider number and receive and process the monies paid by Medicare. Given this irreducible role, I cannot conclude that their role in this scheme was either minor or minimal.

## C. Outside the Heartland

"The [Sentencing Reform] Act did not eliminate all of [a] district court's discretion . . . ." *Koon v. United States*, 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). "Congress allows district courts to depart from the applicable Guideline range if 'the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *Id.* (quoting 18 U.S.C. § 3553(b)); *see also* U.S.S.G. § 5K2.0.

■ A departure may be warranted when a case is atypical compared with cases involving the same criminal conduct:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G., Ch.1, Pt. A, comment 4(b). In considering whether a particular case falls outside the "heartland," the following questions are relevant:

> 1) What features of this case, potentially, take it outside the Guidelines' 'heartland' and make of it a special, or unusual, case?
>
> 2) Has the Commission forbidden departures based on those features?
>
> 3) If not, has the Commission encouraged departures based on those features?
>
> 4) If not, has the Commission discouraged departures based on those features?

*Koon*, 518 U.S. at 95, 116 S.Ct. 2035 (quotation marks and citation omitted). The Supreme Court has explained that these

questions are best answered by the district courts:

> Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing.

*Id.* at 98, 116 S.Ct. 2035.

Defendants seek a downward departure based on their claim that their conduct falls outside the "heartland" created by the fraud guidelines. *See* Vining 9/1 Let. at 2–3; Schrager 8/7 Let. at 7; Kalani 8/31 Let. at 6–7; Tr. at 11–21; 32–35; 38–44; 69–70. Bearing in mind the questions suggested by *Koon,* I now consider whether the particular circumstances surrounding defendants' conduct cause their cases to fall outside the "heartland" of fraud cases.

■ These defendants fall in a highly unusual category, which I shall refer to as "accidental criminals." In my experience, most defendants convicted of fraud plan to commit a crime and engage in significant and sustained efforts to create a fraudulent scheme or cause it to succeed. These defendants were different. I am convinced, after listening to the evidence at two trials and accepting the plea of the other doctor indicted with these defendants, that none of the doctors entered the scheme with criminal intent.[9] They answered advertisements in respected newspapers and believed that they were applying for positions in legitimate clinics. They were assured by Nachamie, the mastermind of the scheme, that it was legal and proper to supervise PAs and FMGs who were providing services to underserved and underprivileged communities. Indeed, Nachamie showed each of them a

document that appeared to support that assurance. *See* GX 83.

Their unusual status as criminals continued once they were employed by Nachamie. The scheme's organizers lied to the doctors in a deliberate attempt to keep them from learning the details of the scheme. Cooperating witnesses testified that Nachamie sought dumb or naive doctors who would not ask too many questions. When they did ask questions, the answers were lies. As noted earlier, these defendants did not submit the bills to Medicare and did not know that the billers were resubmitting bills, billing home visits as office visits, billing one visit as if it were two and, on occasion, forging their signatures. These doctors also did not operate the clinics or recruit clerical workers, FMGs, telemarketers, or beneficiaries.

On the other hand, the doctors' contention that they were Nachamie's victims, rather than criminals, overstates the case. They chose to work for Nachamie and to continue to work at his clinics for many months. One doctor who responded to the newspaper advertisement testified that he knew at the interview that something was wrong. Instead of joining the scheme, that doctor alerted the authorities. These defendants may not have been as savvy, but once they began to review patient charts and receive remittance statements, they must have suspected the fraudulent nature of the scheme almost immediately. The fact that the organizers of the scheme attempted to allay those suspicions with lies indicates that the defendants may have acted with a "diminished" intent for some additional period of time. The transparency of those lies, combined with the additional remittance statements and inquiries from Medicare, eventually caused these defendants to know that the scheme was fraudulent. By continuing to sign the forms and receive the checks, they became

---

9. Indeed, the only doctor who pled guilty—Dr. Alan Siegel—was unable to sufficiently articulate his guilty state of mind during his initial attempt to change his plea on February 25, 2000. On March 1, Dr. Siegel satisfactorily pled guilty by reading a prepared statement admitting to conscious avoidance. He was sentenced on July 21, 2000.

criminals rather than victims, albeit by accident rather than design.

■ The Second Circuit has recognized that a district court can consider a defendant's initial lack of intent in granting a downward departure under § 5K2.0. *See United States v. Broderson*, 67 F.3d 452, 459 (2d Cir.1995) ("Although Broderson was charged and sentenced for fraud, his criminal intent was significantly different from that of the typical fraud defendant. He did not set out to mislead the government.") [10]; *see also United States v. Warren*, 186 F.3d 358, 363–64 (3rd Cir.1999) (reversing upward departure under § 5K2.0 based on large quantity of drugs because "the record evidence is unequivocal that not only did Warren not intend that anyone consume the drugs he carried, but also that he intended to turn those drugs over to government agents and did so."); *cf. Koon*, 518 U.S. at 105, 116 S.Ct. 2035 (upholding downward departure where defendants were convicted of conduct which began as legal but crossed over the line and became illegal). The fact that defendants did not join Nachamie's scheme with criminal intent—and then operated for an additional period of time with "diminished" intent—makes this an "atypical" case that "significantly differs from the norm" and therefore falls outside the "heartland" of the fraud Guidelines. *See* U.S.S.G., Ch.1, Pt. A, comment 4(b). Because the Commission has neither encouraged, discouraged nor forbidden a departure based on this factor, I am granting a downward departure under U.S.S.G. § 5K2.0.[11]

10. In *Broderson*, which the Second Circuit called a "close" case, the district court gave a hefty seven-level departure. *See id.* at 457–60.

11. I acknowledge the potential overlap between the analysis of the mitigating role adjustment and the "outside the heartland" departure. Indeed, the parties often discussed the two concepts interchangeably at oral argument. *See* Tr. at 11–21, 32–35. As explained above, however, I rejected a minor or minimal role adjustment because each of

## D. Restitution

Because the defendants were convicted after April 24, 1996, for offenses against property under Title 18 of the United States Code and because there was an identifiable victim who suffered pecuniary loss, restitution is mandatory under the Mandatory Victims Restitution Act. *See* 18 U.S.C. § 3663A. In addition, district courts are statutorily required to impose the full amount of restitution without consideration of economic factors including a defendant's ability to pay. *See* 18 U.S.C. § 3664(f)(1)(A). However, the Victim and Witness Protection Act ("VWPA") gives district courts great latitude in apportioning the amount of loss among co-defendants:

> [T]he court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

18 U.S.C. § 3664(h).

■ The defendants urge this Court to apportion the amounts of loss attributable to their respective Medicare numbers between themselves and Nachamie. The underlying rationale is that defendants only retained 22% of the payments received from Medicare and remitted the rest to Nachamie. *See* Schrager PSR ¶ 67; Vining PSR ¶ 79; Kalani PSR ¶ 80. According to this argument, the amount of restitution should be limited to the economic gain defendants realized from their crimi-

these doctors played an essential role in Nachamie's scheme. *See supra* Part II.B. In addition, the fact that I rejected a mitigating role adjustment does not prevent me from departing downward on the analytically distinct basis that the defendants lacked initial intent and operated for a period under diminished intent. *See United States v. Bruder*, 103 F.Supp.2d 155, 180 (E.D.N.Y.2000) ("A downward departure may sometimes be warranted in addition to or instead of a mitigating role adjustment.") (collecting cases).

nal activity. This argument, however, is without merit.

In *United States v. Anglian*, 784 F.2d 765, 767 (6th Cir.1986), the district court ordered the defendant to pay $3,162.32, which was one fourth of the unpaid loss. The defendant argued that "restitution must be limited to the amount of benefit he received from the offense charged," namely, $600. *Id.* The Sixth Circuit rejected this argument:

> It is true that, in the civil context, especially under the doctrine of unjust enrichment, restitution is sometimes measured by the benefit received. *See* Restatement (Second) of Restitution § 1 (Tent. Draft No. 1, 1983). We think it is unmistakable from the tenor of these statutes and from the legislative history, however, that Congress did not intend the term 'restitution' as used in the VWPA to be so construed.... Other provisions show further that the purpose of restitution is to make the victim whole. Nowhere in these statutes is the benefit gained by the defendant mentioned as a factor.... In crimes involving money, unconfiscated gains may, as a practical matter, increase the defendant's financial resources, but there is no basis for ruling that the extent of those gains should be the extent of the restitution order.

*Id.* at 767–68 (citations omitted). Although the defendant in *Anglian* had been convicted of conspiracy and two substantive offenses and the defendants in this case were not convicted of conspiracy, I nevertheless find the reasoning of *Anglian* applicable and persuasive.

In seeking an apportionment between themselves and Nachamie, defendants overlook two key points. *First,* the amount of loss has already been apportioned among the defendants based on the amount of payments received under their respective Medicare numbers. To further apportion this loss would place the risk of less than full compensation on Medicare, the victim. *Second,* defendants necessari-

ly contributed to the victim's loss by supplying their Medicare provider numbers and receiving, depositing and distributing the Medicare funds obtained through the fraudulent scheme. Without defendants' Medicare provider numbers, no fraudulent billings could have been submitted and, hence, no payments would have been made. The fact that the lion's share of the illegally derived profits went to Nachamie does not minimize the importance of defendants' participation in the scheme. *See United States v. Martin,* 109 F.Supp.2d 970, 975–76 (C.D.Ill.2000) ("While it is true that Martin received the lion's share of the profits, the illegal scheme could not have been accomplished without Lowder's assistance, and Lowder did receive rewards for his assistance in the illegal scheme in the form of trips, cash, and job prospects. Thus, the Court believes that restitution should be shared jointly and severally to ensure that the victim ... is fully compensated for its loss."). In order to ensure that Medicare is fully compensated for its loss, I decline to apportion the amounts of restitution between the defendants and Nachamie. The amounts of restitution ordered herein shall be imposed jointly and severally with the other co-defendants *See United States v. Tzakis,* 736 F.2d 867, 871 (2d Cir.1984) (court not required to consider lesser degrees of culpability in declining to apportion restitution).

In setting the payment schedules, however, a court must look to the following factors:

(A) the financial resources and other assets of the defendant, ...;

(B) projected earnings and other income of the defendant; and

(C) any financial obligations of the defendant[,] including obligations to dependents.

18 U.S.C. § 3664(f)(1)(B)(2); *see also United States v. Ismail,* 219 F.3d 76, 78 (2d Cir.2000). I will address these factors at the sentencing of each defendant, after

hearing argument from both sides as to their applicability.

### E. Vining's Motions

#### 1. More Than Minimal Planning

■ Vining argues that there should be no enhancement pursuant to U.S.S.G. § 2F1.1(b)(2)(A) for more than minimal planning. This argument is foreclosed by the case law in this Circuit. In *United States v. Rosa*, 17 F.3d 1531, 1552 (2d Cir.1994), our Circuit held that the phrase "if the offense involved more than minimal planning" does not require the defendant's personal involvement in the planning. Rather, when a Guidelines provision speaks in the passive voice, the court interprets the provision as referring to "an offense characteristic, not a characteristic of the individual defendant." *Id.*[12]; *see also United States v. Lewis*, 93 F.3d 1075, 1084 (2d Cir.1996). Because the offense of which Vining was convicted involved more than minimal planning, the enhancement is required.

#### 2. Abuse of Position of Trust

■ Vining also argues that an enhancement for "abuse of a position of trust or use of a special skill," pursuant to U.S.S.G. § 3B1.3, is not warranted because she did not "use her professional medical skill to deviously conceal anything from Medicare or anyone else." Letter of August 1, 2000 from Vining's attorney to the Court ("Vining 8/1 Let.") at 6. Once again, this argument is unavailing. *First,* the Medicare witnesses at trial established that it is the doctors who are entrusted to maintain the program's integrity by submitting only accurate claims for medically necessary services. *See* Gov't 8/17 Let. at 5 (citing relevant portions of trial transcript). *Second,* after being informed by Medicare that a particular bill could not be paid because no services were rendered by her, Vining continued to accept funds for

services she knew she had not personally performed. *Finally,* and most troubling, the patients who participated in this program may have erroneously believed that their cases were monitored by licensed physicians who would make medical judgments based on examinations and test results. That erroneous belief may have caused patients to forego other forms of medical screening and treatment. In combination, all of this activity amounts to abuse of a position of trust and use of a special skill. *See United States v. Ntshona*, 156 F.3d 318, 321 (2d Cir.1998) ("We adopt the view of the other circuits presented with this issue and hold that a doctor convicted of using her position to commit Medicare fraud is involved in a fiduciary relationship with her patients and the government and hence is subject to an enhancement under § 3B1.3.").

### F. Kalani's Motion: Aberrant Conduct

■ Kalani has moved for a downward departure on the ground that his conduct in committing the instant offense was aberrant. In determining whether criminal behavior is aberrant, the Second Circuit has adopted the "totality of the circumstances" test previously employed by the First, Ninth and Tenth Circuits. *See Zecevic v. United States Parole Comm'n*, 163 F.3d 731, 734 (2d Cir.1998). Under this test, conduct which constitutes "a short-lived departure from an otherwise law-abiding life" may justify a downward departure. *Id.* at 735. A court may consider the following factors in determining the aberrant nature of a defendant's behavior:

(1) the singular nature of the criminal act; (2) the defendant's criminal record; (3) the degree of spontaneity and planning inherent in the conduct; (4) extreme pressures acting on the defendant, including any psychological disor-

---

**12.** In *Rosa,* the court considered the language of U.S.S.G. § 2B1.1(b)(4). This language is identical to that found in § 2F1.1(b)(2)(A).

ders from which he may have been suffering, at the time of the offense; (5) the defendant's motivations for committing the crime, including any pecuniary gain he derived therefrom; and (6) his efforts to mitigate the effects of the crime.

*Id.* at 736.

■ Application of the above factors weighs decidedly against a finding of aberrant conduct. First, Kalani's crime can hardly be characterized as singular. Kalani received $172,785 from Medicare in over thirty checks based on countless false claims submitted over a period involving approximately twelve months. While this Court recognizes that crimes involving multiple acts are not necessarily disqualified for an aberrant behavior departure, *see United States v. Grandmaison*, 77 F.3d 555, 563 (1st Cir.1996), the number of fraudulent bills submitted by Kalani, as reflected in the remittance statements he received, are simply too great to consider this crime "singular" by any court's definition. *See United States v. Martinez*, 207 F.3d 133, 137–38 (2d Cir.2000) (defendant's cocaine importation scheme, which spanned at least 13 months, amounted to "a pattern of knowing, planned and deliberate activity that can hardly be described as spontaneous"—court concluded that the "prolonged, calculated and even systematic nature of [defendant's] activity, . . ., leads us to conclude that his actions cannot be characterized as 'aberrant.'").

The second factor, absence of criminal record, while superficially favorable to Kalani, loses much appeal when one considers that " 'aberrant behavior and first offense are not synonymous.' " *Grandmaison*, 77 F.3d at 555 (quoting *United States v. Dickey*, 924 F.2d 836 (9th Cir.1991)). As explained by the *Zecevic* court

> The totality standard in not a blanket rule that anyone without a criminal record will automatically be entitled to a downward departure because an absence of criminal convictions is but one of several factors a court must consider.

*Zecevic*, 163 F.3d at 735. The third factor, degree of spontaneity, weighs against Kalani as he cannot credibly argue that he committed the instant offense spontaneously.

With regard to the fourth factor, Kalani argues that he was acting under extreme pressures and psychological disorders in committing the instant offense. Around the time that Kalani first became associated with the other defendants, his wife had medical problems and he learned that his job was in jeopardy. This was in August 1996. Shortly thereafter, in November 1996, Kalani began seeing a psychiatrist who prescribed medication for both depression and attention deficit disorder. While these circumstances are lamentable, they do not rise to the level of extreme pressure or psychological disorder. *See, e.g., United States v. Fairless*, 975 F.2d 664, 667–68 (9th Cir.1992) (defendant's manic depression and recent job loss were part of "convergence of factors" justifying aberrant behavior departure); *United States v. DeRoover*, 36 F.Supp.2d 531, 532–33 (E.D.N.Y.1999) (single mother's history of abuse, family suicide, need to provide for her five children, and extreme family stress, independently and together, weighed in favor of downward departure). Here, the pressure felt by Kalani was primarily economic and, hence, undeserving of a downward departure. *See Martinez*, 207 F.3d at 138 (the pressures involved must be more than purely economic unless extreme or accompanied by severe psychological disorder).

Given that the pressure experienced by Kalani was economic, it stands to reason that his motivation in committing the crime was pecuniary. "[T]he fact that his motive was pecuniary generally tends to militate against leniency with respect to his sentence." *Id.* Thus, the fifth factor weighs against departure. Finally, there was no mitigation. Although Kalani returned approximately $11,000 as a result of receiving demand letters from Medicare, this was done prior to being indicted. After he was indicted, Kalani could have

taken steps to mitigate his crime, such as accepting responsibility and making voluntary, partial restitution, but he did not. Accordingly, these last two factors cut against a finding of aberrant conduct.

In sum, out of the six *Zecevic* factors, only two arguably help Kalani's cause and then only remotely. Kalani's previous lack of involvement with the criminal justice system cannot, on its own, justify a departure and the pressures he experienced were not extreme. The remaining factors weigh heavily against a finding of aberrant conduct. I therefore decline to grant Kalani a downward departure on this ground.

## III. CONCLUSION

The Court will apply the rulings set forth above at the upcoming sentencing of each defendant. The sentencing of Ghanshyam Kalani is scheduled for Monday, September 25, 2000 at 4:30 p.m. The sentencing of Kenneth Schrager is scheduled for Tuesday, September 26, 2000 at 4:30 p.m. The sentencing of Donna Vining is scheduled for Wednesday, September 27, 2000 at 4:30 p.m.

SO ORDERED: